**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| **DAVID PAUL HUGGINS,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **VS.** | : | **NO. 5:11-CV-117 (MTT)** |
| | : | |
| **STEVE ROBERTS, *et al.*,** | : | |
| | : | **Proceedings under 42 U.S.C. § 1983** |
| **Defendants,** | : | **Before the U.S. Magistrate Judge** |
| _____ | : | |

## RECOMMENDATION

Before the Court is an unopposed Motion for Summary Judgment filed by Defendants Steve Roberts, John Ford, Willie Sue Mickens, James Taylor, James Jackson, Calvin Fortune, Belinda Lamb, Elaine Dixon, Lizzie Byrd, Lisa Bush, Karen Brown, and Dr. Michael Rogers. Doc. 38. Because Plaintiff has failed to demonstrate a genuine issue of material fact, and because Defendants are entitled to judgment as a matter of law, it is hereby **RECOMMENDED** that Defendants' Motion for Summary Judgment be **GRANTED**.

## PROCEDURAL HISTORY

On March 30, 2011, Plaintiff David Paul Huggins, proceeding *pro se* at the time, filed this action pursuant to 42 U.S.C. § 1983 against various prison officials and medical staff members alleging deliberate indifference to his serious medical needs. Doc. 1. Plaintiff's allegations stem from Washington State Prison's policy implementing triple-bunking of inmates and Plaintiff's injuries resulting from his fall off the top of a three-man bunk.

On August 8, 2011, Defendants James E. Donald, David L. Frazier, and Brian Owens filed a Motion to Dismiss. Doc. 23. On January 11, 2012, the remaining defendants filed a Motion for Summary Judgment. Doc. 38. The following day, the Court ordered Plaintiff to

respond to Defendants' Motion for Summary Judgment. Doc. 39. On January 23, 2012, the Court issued a Recommendation to grant Defendants' Motion to Dismiss, finding that Plaintiff failed to state a claim against Defendants Donald, Frazier, and Owens for implementing the triple-bunking policy at Washington State Prison. Doc. 40. The Court then granted Plaintiff's Motion for Extension of Time (Doc. 41) to respond to Defendants' Motion for Summary Judgment and object to the Recommendation. Doc. 42. Plaintiff failed to file a response or an objection. On March 12, 2012, the Court adopted the Recommendation to grant the Motion to Dismiss, and Defendants Donald, Frazier, and Owens were dismissed from this action.

Despite Plaintiff's failure to respond to the Motion for Summary Judgment, Plaintiff, now represented by Attorney Delisa Williams, filed a Motion to Amend Complaint on March 27, 2012. Doc. 44. In his Motion to Amend Complaint, Plaintiff reasserted claims made in his original complaint, including claims based on vicarious liability that had previously been dismissed by the Court for failure to state a claim (Docs. 30, 42). On March 29, 2012, the Court denied Plaintiff's Motion to Amend Compliant. Doc. 45. Plaintiff has neither personally nor through Attorney Williams requested another opportunity to respond to the instant Motion for Summary Judgment.

<u>LEGAL STANDARDS</u>

Summary judgment is proper if the evidence shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The movant bears the burden of establishing the absence of a dispute over a material fact. Reynolds v. Bridgestone/Firestone, Inc., 989 F.2d 465, 469 (11th Cir. 1993). The evidence and factual inferences made from the evidence are viewed favorably to the party opposing summary judgment. Reynolds, 989 F.2d at 469.

2

The moving party must meet its burden even if the non-moving party fails to respond to a motion for summary judgment. Courts "cannot base the entry of summary judgment on the mere fact that the motion was unopposed, but, rather, must consider the merits of the motion." United States v. One Piece of Real Property Located at 5800 SW 74th Ave., Miami, Florida, 363 F.3d 1099, 1101 (11th Cir. 2004). In considering the merits of an unopposed motion for summary judgment, a court

> need not *sua sponte* review all of the evidentiary materials on file at the time the motion is granted, but must ensure that the motion itself is supported by evidentiary materials. At the least, the district court must review all of the evidentiary materials submitted in support of the motion for summary judgment.

Id. at 1101-02. In other words, the court cannot simply accept the facts stated in a moving party's statement of material facts as true, but must also review the movant's citations to the record and confirm that there are no issues of material fact. Id. at 1103 n. 6. Pursuant to Rule 56(c), the court "need consider only the cited materials, but it may also consider other materials in the record." FED. R. CIV. P. 56(c).

## FACTUAL BACKGROUND

The allegations contained in Plaintiff's Compliant relate to five separate events or conditions: (1) Plaintiff's arrival at Washington State Prison (WSP); (2) Plaintiff's fall on December 3, 2008 and Defendants' immediate response; (3) Plaintiff's medical treatment between December 4, 2008 and February 23, 2009; (4) Plaintiff's medical treatment between February 23, 2009 and June 10, 2009, the date that Plaintiff underwent surgery; and (5) Plaintiff's medical treatment upon his return to WSP following his surgery.

Although Plaintiff did not respond to the instant Motion for Summary Judgment, Defendants have provided Plaintiff's deposition in support of their motion. Plaintiff detailed his claims

against each Defendant in his testimony. As such, Plaintiff's account of the incidents will therefore be taken from his testimony.

1. <u>Plaintiff's arrival at WSP</u>

On November 4, 2008, Plaintiff was transferred into WSP. Pl.'s Dep. at 17 (Doc. 38-16). Although Plaintiff at one point had a bottom-bunk profile while at a previous facility, Plaintiff no longer had the profile when he was transferred to WSP. Def. Exhibit M (Doc. 38-15). Upon his arrival at WSP, Plaintiff was assigned to the top of a three-level bunk. Pl.'s Dep. at 34-35 (Doc. 38-16). Because Plaintiff did not like the crowded environment of a three-man cell, he attempted to obtain a bottom-bunk profile at WSP. <u>Id.</u> at 24. On November 10, 2008, Plaintiff requested a bottom-bunk profile from Defendant Nurse Brown, citing back problems and his cellmates' smoking as reasons for the profile. Def. Exhibit M (Doc. 38-15). Plaintiff admits that his desire for a bottom-bunk profile was not based on his medical condition or safety issues concerning triple-bunking. Pl.'s Dep. at 30, 125 (Doc. 38-16). Plaintiff's attempts to obtain a bottom-bunk profile were essentially attempts to get placed in a more comfortable two-man cell. <u>Id.</u> at 30.

2. <u>Plaintiff's fall and Defendants' response</u>

At approximately 9:30 p.m. on December 3, 2008, Plaintiff fell while attempting to climb down from his top bunk. <u>Id.</u> at 19. Plaintiff's chin hit a metal desk as Plaintiff was falling to the floor. <u>Id.</u> Plaintiff was momentarily "knocked out," and Plaintiff's chin was cut and began to bleed. <u>Id.</u> Plaintiff covered his chin with a towel and approached Defendant Byrd for assistance. <u>Id.</u> at 20. Defendant Byrd informed Plaintiff that the medical staff was gone for the evening, and that there was nothing she could do to help Plaintiff. <u>Id.</u> at 20-21. Plaintiff continued to complain to Defendant Byrd about his chin and began complaining about pain in his neck and back. <u>Id.</u> at 21.

After informing Plaintiff again that medical was gone for the evening, Defendant Byrd allowed Plaintiff to accompany her to security as she was leaving for the night. Id. at 22-23. Defendant Byrd escorted Plaintiff to security and Plaintiff was met by Defendant Lt. Fortune. Id. at 36. Defendant Fortune provided Plaintiff with a first aid kid to clean and bandage his chin. Id. at 37. Defendant Fortune suggested to Plaintiff that an ambulance was likely unnecessary, and Plaintiff agreed. Id. at 36-37. Defendant Fortune also gave Plaintiff ibuprofen and asked if Plaintiff would be alright until morning, and Plaintiff responded "yes, sir." Id. at 37. Defendant Fortune also filled out an urgent care form for Plaintiff to be seen by medical in the morning. Id.; Fortune Aff. (Doc. 38-6); Attachment 1 (Doc. 38-14).

3. Plaintiff's medical treatment between December 4, 2008 and February 23, 2009

Plaintiff's testimony regarding his medical treatment from the following day until February 23, 2009 is in direct conflict with Plaintiff's medical records. Whereas Plaintiff contends he was denied any treatment for days, the medical records show that Plaintiff was treated the next morning, December 4, 2008 at 9:00 a.m.

Plaintiff contends that despite numerous request to different Defendants, he was denied any form of medical treatment until the following Monday, December 8, 2008. Plaintiff states that he first asked Defendant Lamb about going to medical on December 4, and that Defendant Lamb informed him that no one had put in an emergency sick call request for Plaintiff the previous night. Pl.'s Aff. at 39-40 (Doc. 38-16). Defendant Lamb also told Plaintiff that there was nothing that she could do for him regarding his injuries. Id. Plaintiff then explained his situation to Defendant Jackson, who informed Plaintiff that he would look into the situation. Id. at 42. Plaintiff states that a sick call was finally made, but that he was told that he would have to wait until Monday because no medical staff would be at the jail from Friday until Sunday. Id. at

44. Plaintiff also testified that he asked Defendant Jackson multiple times over the weekend to be taken to see someone for his pain, but that Defendant Jackson did not assist Plaintiff. <u>Id.</u>

Plaintiff alleges that he was finally able to get to medical on October 8, 2008. Upon his arrival at medical, Plaintiff was treated with ibuprofen for pain, an ace bandage for his wrist, and a heat rub for his back. <u>Id.</u> at 53. Plaintiff states that he was treated at medical four or five times during the next thirty days. <u>Id.</u> At some point during that period, Plaintiff was also given a neck brace. <u>Id.</u> Plaintiff testified that despite his treatment, he continued to experience pain in his neck and back. <u>Id.</u> Plaintiff states that although his pain medication was increased and he was given muscle relaxers, he felt that he needed an x-ray to find out what was wrong with his neck and back. <u>Id.</u> at 80, 101. Plaintiff states that he asked Defendants Mickens, Roberts, Ford, Taylor, Nurse Brown, and Nurse Bush for more aggressive treatment for his condition, including obtaining an x-ray. <u>Id.</u> at 60-100. Plaintiff alleges that he was seen at medical approximately forty-two times between the night of his fall and the time he got an x-ray. <u>Id.</u> at 62.

During this time period, Plaintiff also made numerous attempts to obtain a bottom-bunk profile. Plaintiff made requests to Defendants Mickens, Dixon, and Lamb to be moved to a bottom bunk, but they denied his requests because he did not have a bottom-bunk profile. <u>Id.</u> at 55-77. Plaintiff states that Defendants Mickens, Dixon, and Lamb refused to assist him in obtaining a bottom-bunk profile. <u>Id.</u> Plaintiff also states that he requested that Defendants Nurse Bush and Nurse Brown give him a bottom-bunk profile, but they did not give him a bottom bunk profile until April. <u>Id.</u> at 61-62.

Plaintiff's medical records contradict Plaintiff's testimony regarding his treatment during this time period. Plaintiff appears on the "Urgent/Emergent Encounters" list stating that Plaintiff suffered a laceration on his chin on December 3, 2008 at 9:45 p.m. and was seen by medical on

December 4, 2008. Doc. 38-14. Plaintiff is also listed on a separate log stating that he was seen by medical staff on December 4, 2008. Additionally, Plaintiff's records contain a detailed nursing assessment made by Defendant Brown on December 4, 2008. Exhibit M at 5 (Doc. 38-15). The assessment states that Plaintiff suffered a superficial half-inch laceration on his chin and that it had been cleaned and bandaged. Id. The assessment further states that Plaintiff had movement in all extremities with a little decreased movement in his right wrist, likely indicating a sprain. Id. Plaintiff's neck was also examined, and Plaintiff had a full range of motion in his neck and slight stiffness on one side. Id. Plaintiff was given Advil, a wrap for his wrist, and an ice pack with instructions to alternate ice and moist heat to his neck for soreness. Id.

Plaintiff's medical records show that he was not seen again by medical staff regarding his neck and back injuries until February 23, 2009. Id. at 10. Plaintiff was seen by medical staff, however, on February 3, 2009 and February 4, 2009 regarding issues of weight loss. Id. at 7-8. Plaintiff was also seen by medical staff on February 17, 2009 regarding upper respiratory complaints. Id. at 9. Additionally, the prison's sick call log also indicates that Plaintiff put in a sick call request on January 21, 2009, due to his weight issues. Doc. 38-14.

4. Plaintiff's medical treatment between February 23, 2009 and June 10, 2009

Plaintiff's medical records indicate that Plaintiff received significant medical treatment beginning on February 23, 2009. On February 23, 2008, Plaintiff was examined by Nurse Kelly Hartley after Plaintiff complained of neck, back, and arm pain. Def.'s Exhibit M at 10 (Doc. 35-18). Plaintiff stated that the pain had been present for over a year, but that it had gotten worse since his fall. Id. Plaintiff also indicated that he had numbness and tingling in both of his arms and his fingers. Id. Nurse Hartley found that Plaintiff had tenderness and crepitus (a crunching feeling in a joint) in his shoulders, and that Plaintiff experienced pain when bending backwards

and when moving his shoulders. Id. Nurse Hartley prescribed Plaintiff pain medication and instructed Plaintiff to apply moist compresses to the painful areas. Id. Nurse Hartley also referred Plaintiff to an upper-level medial provider.

The following day, Plaintiff was seen by Defendant Bush, who is an upper level medical provider at WSP. Id. at 11. Despite Plaintiff's complaints of neck and back pain, Defendant Bush found that Plaintiff maintained his strength in these areas. Id. Defendant Bush's examination of Plaintiff included a Cranial Nerve Exam and a General Neurology Exam. Id. All of Plaintiff's symptoms were found to be within normal limits. Id. Because Defendant Bush was aware of Plaintiff's fall, she ordered x-rays of his neck and lower back. Id. Defendant Bush also prescribed Plaintiff Motrin and the muscle relaxer Robaxin, and Defendant Bush issued Plaintiff a medical profile for a "short-walk pass" allowing him to take shortcuts around the prison. Id.

Plaintiff's x-rays were reviewed by Dr. Howard P. Schiele on February 26, 2009. Id. at 13. Dr. Schiele reported that Plaintiff's back x-ray was normal and revealed no fracture or bone disease. Id. Dr. Schiele also found that Plaintiff's neck x-ray showed straightening of the cervical spine and moderately severe degenerative disc disease. Id. Because Plaintiff's condition was degenerative, it was unclear whether his condition was a result of deterioration over time or related to Plaintiff's fall. Id. Defendant Bush reviewed Plaintiff's x-ray report and determined that Plaintiff's condition was a chronic ongoing problem that did not require emergency treatment, and that treatment of Plaintiff's symptoms was appropriate. Bush Aff. (Doc. 38-4). Defendant Bush scheduled a follow up appointment for March 9, 2009. Id.

On March 5, 2009, Plaintiff submitted a sick call request and was seen by Nurse Hartley regarding pain in his neck, arms, and back. Def.'s Exhibit M at 14 (Doc. 38-15). Plaintiff was given medication for his symptoms and informed that he would see Defendant Bush on March 9.

Id. Plaintiff also requested a bottom-bunk profile. Id. Defendant Bush examined Plaintiff on March 9, 2009. Id. at 15. Plaintiff's medications were increased and Plaintiff was given a bottom-bunk profile. Id. at 12, 15.  Plaintiff was seen again on March 24, 2009, and Defendant Bush continued the conservative treatment because she believed that Plaintiff was responding to the treatment based on the results of his examination. Id. at 16.

On April 7, 2009, Plaintiff submitted another sick call complaining that his symptoms had gotten worse. Defendant Bush examined Plaintiff and determined that he had a slight decrease in strength in his right and a decreased range of motion in his neck. Id. at 17. Because Plaintiff's symptoms had changed, Defendant Bush discussed Plaintiff's condition with Defendant Dr. Rogers, who recommended that an MRI be taken of Plaintiff's neck. Id. Plaintiff was given new medications, and an MRI was ordered the following day to determine Plaintiff's responses to treatment. Id. Because an MRI is not a routine procedure at WSP, Plaintiff's test was not conducted until May 6, 2009. Id. at 20. Meanwhile, Defendant Bush performed routine examinations on April 13 and April 30, and Plaintiff's condition appeared to remain stable. Id. at 22-24.

Dr. Bush reviewed Plaintiff's MRI report on May 13, 2009. Id. at 27. The MRI report revealed that Plaintiff suffered from osteoarthritis of the joints in the spinal vertebrae and narrowing of the spinal canal, as well as disc herniation resulting in mild to moderate compression of Plaintiff's spinal cord. Id. Based on the report, Defendant Bush requested that Plaintiff receive a consultation with a neurosurgeon. Id. On the same day, Defendant Bush explained the MRI report and her decision to consult a neurosurgeon to Plaintiff. Id. at 26. Plaintiff informed Defendant Bush that he had been feeling better. Id. Defendant Bush

nevertheless placed Plaintiff on medically unassigned status relieving him from prison work detail and gave Plaintiff a major steroid anti-inflammatory medication. Id.

On May 21, 2009, Plaintiff was examined by neurosurgeon Dr. Paul King. Id. at 28-30. Dr. King found that Plaintiff suffered from cervical spondylosis and disc herniation, which required anterior cervical fusion surgery. Id. Dr. King prescribed a hard collar and wedge pillow for Plaintiff. Id. On May 26, 2009, Plaintiff was issued a wedge pillow and a soft cervical collar to use until the medical staff could obtain a hard collar. Id. The following day, Dr. King also requested that Plaintiff receive a bone stimulator to aid his is recovery from surgery. Id. at 35. Defendant Bush was able to gain approval for the bone stimulator, which was purchased the same day. Id. at 35-39.

Following Dr. King's recommendation that Plaintiff receive surgery, Defendant Bush submitted an urgent request for Plaintiff to have surgery performed. Plaintiff was initially scheduled to receive the surgery on May 29, 2009 at the Atlanta Medical Center. Id. at 31-34. As such, Plaintiff was transferred to Metro State Prison on May 28, 2009 for surgery. Dr. King, however, rescheduled the surgery for June 10, 2009. Id. at 40. Plaintiff underwent anterior cervical fusion surgery on June 10. Id. at 41-42. Dr. King ordered that Plaintiff not perform any lifting or overhead work and that Plaintiff wear a cervical collar at all times except while showering. Id.

5. Plaintiff's medical treatment upon his return to WSP

Plaintiff returned to WSP on June 18, 2009. At that time, Defendant Bush prescribed Neurontin and Ultram for Plaintiff's pain, extended Plaintiff's bottom-bunk profile, exempted Plaintiff from any lifting or climbing, and required Plaintiff to wear a cervical collar at all times. Id. at 37, 43. On June 22, 2009, Defendant Bush saw inmate Huggins to follow up on his

condition. Id. at 44. Due to his complaints of not having enough time to eat, Defendant Bush provided Plaintiff with a slow eating medical profile to allow him an additional fifteen (15) minutes to eat his meals. Id. Plaintiff also admitted to not wearing his cervical collar at all times and wearing it improperly at other times for comfort. Id.

Plaintiff continued his follow up appointments and treatments as ordered by Dr. King. Id. at 45-47. On July 20, 2009, Defendant Bush extended Plaintiff's medically unassigned status and bottom-bunk profile. Id. Defendant Bush continued Plaintiff's slow-eating profile on August 3, 2009 and again extended the profiles on November 16, 2009. Id. Plaintiff's bottom bunk and no lifting profiles were extended again on February 23, 2010 and his slow eating profile was extended on April 28, 2010. Id.

DISCUSSION

Plaintiff essentially alleges three sets of claims against Defendants: (1) that Defendant Mickens violated his Eight Amendment rights based on WSP's practice of triple-bunking; (2) that WSP staff and officials were deliberately indifferent to his serious medical needs; and (3) that members of the WSP medical staff were deliberately indifferent to his serious medical needs. Because Plaintiff has failed to show that there are genuine issues of material fact regarding his medical treatment at WSP, and because the record indicates that Plaintiff received adequate treatment for his injuries at WSP, Defendants are entitled to judgment as a matter of law.

1. Triple-Bunking at WSP

Because the use of triple-bunking to combat overcrowding does not, alone, pose a significant danger to a prisoner's health and safety, Defendant Mickens did not violate Plaintiff's

Eight Amendment right against cruel and unusual punishment. Futher, Plaintiff has failed to show that Defendant Mickens acted with deliberate indifference to Plaintiff's health and safety.

The policy of triple-bunking does not create a condition of confinement where inmates are subjected to significant health and safety risks sufficient to constitute cruel and unusual punishment under the Eighth Amendment. Under the Eight Amendment, "only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment." Whitley v. Albers, 475 U.S. 312, 319 (1986).  All claims challenging conditions of confinement under the Eighth Amendment, at a minimum, require that the plaintiff demonstrate an "unquestioned and serious deprivation of basic human needs" such as medical care, exercise, food, warmth, clothing, shelter, or safety. Rhodes v. Chapman, 452 U.S. 337, 347 (1981). Moreover, "conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional. To the extent such conditions are restrictive or even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." Id.

In order to be held liable under the Eighth Amendment, a prison official must satisfy two requirements: (1) the objective component, that the prison official's act or omission was sufficiently serious to violate the Eighth Amendment; and, (2) the subjective component, that the prison officials "acted with a sufficiently culpable state of mind" with regard to the condition at issue. Hudson v. McMillan, 503 U.S. 1, 8 (1992); see also Farmer v. Brennan, 511 U.S. 824, 834 (1994).

In this case, Plaintiff has failed to establish both the objective and subjective components of an Eighth Amendment claim. To establish the objective component, the inmate must show that he is subject to conditions that pose a substantial risk of serious harm. Farmer, 511 U.S. at 834. In order for a substantial risk of serious harm to exist, the conditions must be "sure or very

12

likely to cause serious illness and needless suffering," and give rise to "sufficiently imminent dangers." <u>Baze v. Rees</u>, 553 U.S. 35, 49-50 (2008).  The use of triple-bunking, even where the top bunk does not have a guardrail, does not amount to a condition that causes "unquestioned and serious deprivations of basic human needs." <u>Rhodes</u>, 452 U.S. at 347-48.[1]

Although Petitioner did in fact fall from the three-man bunk, this single occurrence is not sufficient to establish a substantial risk of imminent harm imposed by triple-bunking. Plaintiff asserts that other victims have fallen, but this vague assertion is insufficient to support a claim that triple-bunking creates a risk of imminent serious injury or needless suffering. Further, Plaintiff has failed to allege any other condition of his confinement that, in conjunction with the use of triple-bunking, has created a substantial risk to his health and safety. Moreover, Plaintiff admits that his concerns regarding triple-bunking are not related to his safety due to the height of the bunk, but rather to general concerns of comfort and overcrowding.

Additionally, Plaintiff has failed to establish the subjective component of an Eighth Amendment violation. To establish the subjective component, the plaintiff must establish that the prison official was deliberately indifferent to the health and safety of the inmates. <u>Farmer</u>, 511 U.S. at 835. To show deliberate indifference, the plaintiff must show that the defendant's actions were more blameworthy than negligence. <u>Id.</u> at 836 n. 4 (stating that even gross negligence does not rise to the level of deliberate indifference). The defendant must actually know of a significant risk to inmates' health and safety and intentionally disregard that risk to in order to be held liable. <u>Id.</u> at 837. An action by a defendant with no signs of malevolence or a culpable state of mind does not give rise to an Eighth Amendment violation. <u>Baze</u>, 553 U.S. at 50.

---

[1] <u>Rhodes</u> involves the use of double-bunking. The Court does not find that the addition of a third bunk, absent any other distinction, significantly deprives an inmate of basic human needs.

The record in this case fails to establish that Defendant Mickens was deliberately indifferent to inmates' health and safety based on the policy of triple-bunking. Plaintiff admits that he never fell off his top bunk prior to December 3, 2008, and Plaintiff was not aware that any other inmate had fallen off of a triple bunk prior to Plaintiff's fall. Pl.'s Dep. at 124, 126 (Doc. 38-16). Further, Plaintiff admits that he did not approach Defendant Mickens or any other prison official prior to his fall regarding safety concerns surrounding triple-bunking. Id. at 125. At most, the use of triple-bunking could be considered negligent based on a possibility that inmates could fall from the bunks and injure themselves. The policy of triple bunking, however, does not rise to deliberate indifference of the inmates' health and safety. Accordingly, Petitioner has failed to establish both the objective and subjective component of his Eighth Amendment claim against Defendant Mickens.[2]

2. <u>Deliberate indifference to serious medical needs by WSP staff and officials</u>

Plaintiff's claims against WSP staff and officials involve numerous allegations of the prison staff's failure to provide Plaintiff access to medical treatment and failure to provide Plaintiff with a bottom bunk. Because the record indicates that WSP staff and officials provided Plaintiff with access to medical care and that WSP staff and officials did not have the authority to provide Plaintiff with a bottom-bunk profile, Plaintiff's claims against WSP staff and officials are without merit.

To create genuine issues of material fact, Plaintiff must point to evidence that Defendants were deliberately indifferent to Plaintiff's medical needs. The Eighth Amendment prohibits cruel and unusual punishment, including deliberate indifference to a serious medical need. <u>Estelle v.</u>

---

[2] Additionally, it appears that the Georgia Department of Corrections (GCOC) implemented the triple-bunking policy at WSP, and that Defendant Mickens was not personally responsible for the policy. Defendants Owens, Frazier, and Donald—employees of GDOC—were dismissed on from this action for the reasons discussed above.

Gamble, 429 U.S. 97, 106 (1976); Campbell v. Sikes, 169 F.3d 1353, 1363 (11th Cir. 1999). To show deliberate indifference, the prisoner must satisfy both an objective and a subjective component. Campbell, 169 F.3d at 1363. With regard to the objective component, a prisoner must allege both an objectively serious medical need that, if left unattended, poses a substantial risk of serious harm, and also that the response by the prison official to that need was poor enough to constitute an unnecessary and wanton infliction of pain. Taylor v. Adams, 221 F.3d 1254, 1258 (11th Cir. 2000). With respect to the subjective component, a prisoner must allege, and ultimately prove, three facts: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and, (3) by conduct that is more than mere negligence. McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999).

It is not enough, then, to show that the care provided was less than optimal, or that a different course of treatment might have been preferable. The elements required to prove the subjective component of a deliberate indifference claim establish that "mere accidental inadequacy, negligence in diagnosis or treatment, [and] even medical malpractice" are not actionable under 42 U.S.C. § 1983. Taylor, 221 F.3d at 1258. A prisoner cannot establish a violation simply because he "may have desired different modes of treatment" that that which was provided to him. Hamm v. DeKalb County, 774 F.2d 1567, 1576 (11th Cir. 1985). Such course of treatment claims, by definition, involve the "exercise of professional judgment" and as such are not actionable. Estelle, 429 U.S. at 105.

In this case, there is insufficient evidence to create a genuine issue of material fact regarding the WSP staff and officials' roles in Plaintiff's ability to receive medical treatment at WSP. The majority of Plaintiff's claims against WSP staff and officials arise from Plaintiff's alleged failure to be treated for five days following his fall and failure to be placed in a bottom

bunk. There is significant conflict between Plaintiff's testimony and Plaintiff's medical record regarding his treatment on December 4, 2008, the day following Plaintiff's fall. Although courts are required to view the evidence in the non-movant's favor, courts need not accept the non-movant's version of the events when his version is contradicted by his medical records. Bennett v. Parker, 898 F.2d 1530, 1533-34 (11th Cir. 1990); Brown v. Smith, 813 F.2d 1187, 1189 (11th Cir. 1987). Despite Plaintiff's allegations, the medical records clearly indicate that Plaintiff was treated for his injuries on December 4, 2008.

The evidence further shows that Defendants Byrd and Fortune were not deliberately indifferent to Plaintiff's medical needs on the night of his fall. Because the WSP medical staff was gone for the evening, Defendants were not able to send Plaintiff to medical on December 3, 2008. Although Plaintiff alleges that Defendant Byrd refused to help him at first, Plaintiff admits that Defendant Byrd escorted Plaintiff to security so that Plaintiff could receive first aid. Once Plaintiff reached security, Defendant Fortune provided Plaintiff with first aid to bandage his lacerated chin. Defendant Fortune did not believe that Plaintiff's injures required an ambulance to be called, and Plaintiff told Defendant Fortune that he could wait until morning to be seen by medical. Accordingly, Defendant Fortune put in an emergency sick call request for Plaintiff to be seen by medical the following morning.

Plaintiff also alleges that that Defendants Fortune, Lamb, Jackson, and Mickens did not assist Plaintiff in getting medical treatment until December 8, 2008. Plaintiff's medical records, however, show that Plaintiff was treated for his injuries on December 4, 2008. Accordingly, any claims arising from Plaintiff's allegations that he did not receive treatment until December 8, 2008 are without merit.

Additionally, there is not sufficient evidence to support claims against WSP staff and officials regarding Plaintiff's failure to receive medical treatment between December 4, 2008 and February 23, 2009. According to prison records and Plaintiff's medical records, Plaintiff did not attempt to obtain medical treatment for his injuries until February 23, 2009. Taking Plaintiff's versions of the facts as true, Plaintiff was provided with bandages, braces, and a regular medicinal regime during this time period. There is no evidence in the record that Plaintiff was denied adequate medical treatment by WSP staff and officials during this time period, and there is no evidence that WSP staff and officials were subjectively aware that Plaintiff's injuries required more treatment than he alleges that he received during this time period.

Plaintiff also asserts claims against Defendants Mickens, Roberts, Ford, and Taylor for failing to assist Plaintiff in getting more aggressive treatment for his injuries. These defendants, however, did not have authority to make any changes or decisions regarding an inmate's medical treatments. GDOC SOP VH01-0002 (Doc. 38-10). Accordingly, Plaintiff's claims against these defendants regarding the methods of treatment he received at WSP are without merit.

Plaintiff also makes a number of claims against WSP staff and officials regarding his failure to obtain a bottom bunk. Bottom-bunk profiles must be provided by medical staff based on medical reasons requiring such a profile. Bush Aff. (Doc. 38-4). Accordingly, WSP staff and officials were without authority to give Plaintiff a bottom-bunk profile. Plaintiff's medical records show that Defendant Nurse Bush gave Plaintiff a bottom-bunk profile on March 9, 2009. Plaintiff's Movement History shows that Plaintiff was assigned to a bottom or middle bunk while at WSP beginning on March 9, 2009. Doc. 38-3. Because the middle bunk of a triple-bunk bed is not significantly higher off of the ground than a bottom bunk of a double-bunk bed, a middle

bunk qualifies for a bottom-bunk profile. Bush Aff. (Doc. 38-4). Accordingly, Defendants did not violate Plaintiff's profile by placing him in a middle bunk.

There was, however, one night where Plaintiff was not properly assigned to a middle or bottom bunk. On June 18, 2009, Plaintiff was mistakenly assigned to a top bunk when he returned to WSP after receiving neck surgery. Micken's Aff. (Doc. 38-3). The error, however, was caught the next day and Plaintiff was reassigned to a bottom bunk. Id.[3] As the error was corrected the following day, there is not sufficient evidence to establish that the WSP staff and officials were deliberately indifferent.

Because the evidence fails to establish that WSP staff and officials were deliberately indifferent to Plaintiff's serious medical needs by denying Plaintiff access to medical care or to a bottom bunk, Plaintiff's claims against these defendants are without merit.

3.  Deliberate indifference to Plaintiff's serious medical needs by WSP medical staff

Plaintiff's remaining claims allege that Defendants Bush, Brown, and Dr. Rogers were deliberately indifferent to serious medical needs for failing to provide Plaintiff with adequate treatment for injuries sustained from his fall. The record shows that Plaintiff received adequate treatment for his injuries in the months following his fall. As such, Plaintiff has failed to demonstrate a genuine issue of material fact relating to his claims against Defendants Bush, Brown, and Dr. Rogers.

Plaintiff's medical records indicate that he was given adequate medical treatment for his neck and back injuries. As discussed above, Plaintiff's testimony regarding his treatment from December 4, 2008 until February 23, 2009 is at odds with his medical records. Plaintiff's medical records show that Defendant Brown treated Plaintiff's injuries on December 4, 2008.

---

[3] Plaintiff also states that he was able to convince his cellmate to trade bunks with him that evening. Pl.'s Dep. at 118 (Doc. 38-16).

Defendant Brown performed an assessment of Plaintiff's injuries and provided what she believed to be the necessary treatment. Brown Aff. (Doc. 38-12); Bush Aff. (Doc. 38-4). According to Plaintiff's medical records, he did not complain of his injuries again until February 23, 2009, although Plaintiff was seen by medical staff in the interim for weight-related issues.

According to Plaintiff, he was seen by medical staff a total of forty-two times between December 8, 2008 and the time an x-ray was ordered, which was February 23, 2009. Plaintiff alleges that during this time period he received only pain relievers, muscle relaxers, bandages, braces, and heating pads for his injuries. Plaintiff alleges that he continued to request an x-ray and more aggressive treatment at this time, and that he complained of pain in his back, neck, and arms. Even taking these allegations as true, Plaintiff fails to allege sufficient facts to support a finding that Defendants were subjectively aware of the need for more aggressive treatment during this time period.

Plaintiff's medical records beginning on February 23, 2009, show that Plaintiff received substantial medical treatment. Plaintiff was examined on February 23 by Nurse Hartley. Nurse Hartley treated Plaintiff's symptoms and referred Plaintiff to an upper-level provider. Plaintiff was seen the following day by Defendant Bush, who performed more tests on Plaintiff. Based on Defendant Bush's observations, Plaintiff was provided with medication and given instructions on how to care for his injuries. Defendant Bush also ordered an x-ray of Plaintiff's neck and back due to his history of a fall. Plaintiff's x-rays revealed degenerative problems in Plaintiff's neck but did not show any signs of a fracture. Based on the x-ray, Defendant Bush continued the conservative treatment and did not believe any emergency measures were necessary.

Despite this treatment, Plaintiff's condition did not improve in the following weeks. Accordingly, Plaintiff's medications were increased and Plaintiff was given a bottom-bunk

profile on March 9, 2009. Based on the results of Plaintiff's physical examination on March 24, 2009, Defendant Bush continued the conservative treatment. Plaintiff's symptoms deteriorated by April 7, 2009, and Defendant Bush and Defendant Rogers requested an MRI of Plaintiff's neck. As it is not common for the prison to provide an MRI, there was some necessary delay in scheduling an MRI appointment for Plaintiff following Defendants' request. After the MRI was performed on May 7, 2009, it was revealed that Plaintiff suffered from osteoarthritis of the joints in the spinal vertebrae and narrowing of the spinal canal, as well as disc herniation. Based on the report, Defendants referred Plaintiff to a neurosurgeon.

Following the recommendation of neurosurgeon Dr. King, Plaintiff underwent spinal surgery on June 10, 2009. Plaintiff's surgery was successful, and Defendants were able to secure a bone stimulator to aid Plaintiff in his recovery. Upon his return to WSP, Defendants provided Plaintiff with additional medical profiles and treatment. There is nothing in the record to indicate that Plaintiff was denied medical treatment following his surgery.

The crux of Plaintiff's complaint against Defendants Bush, Brown, and Dr. Rogers relates to Defendants' failure to provide more aggressive treatment prior to Plaintiff obtaining surgery. Plaintiff's medical records, however, show that Plaintiff's symptoms were systematically treated and that Defendants believed that the treatment was helping Plaintiff. At most, Plaintiff's claims against Defendants for not providing more aggressive treatment sooner give rise to a claim of medical malpractice. Such course of treatment claims are not actionable under 42 U.S.C. § 1983. See Estelle, 429 U.S. at 105.

## CONCLUSION

Because the evidence in the record of this case is insufficient to permit a finding that Defendants were deliberately indifferent to Plaintiff's serious medical needs, it is hereby

**RECOMMENDED** that Defendants' Motion for Summary Judgment be **GRANTED**. Pursuant to 28 U.S.C. § 636 (b)(1), the parties may serve and file written objections to this **RECOMMENDATION** with the district judge to whom the case is assigned **WITHIN FOURTEEN (14) DAYS** after being served with a copy thereof.

  **SO RECOMMENDED**, this 6th day of July, 2012.


         s/ Charles H. Weigle_____
         Charles H. Weigle
         United States Magistrate Judge